Kenneth JONES, Libellant,

v.

**AMERICAN EXPORT ISBRANDTSEN LINES, INC., Respondent.**

Nos. 64 AD. 211, 1351.

United States District Court
S. D. New York.

June 5, 1968.

Burton H. Hall, New York City, of counsel, for libellant.

Haight, Gardner, Poor & Havens, New York City, for respondent, by Lennard K. Rambusch and Stephen K. Carr, New York City.

## OPINION

POLLACK, District Judge.

The libellant, a seaman, seeks to recover overtime wages and transportation costs claimed to be due him as a result of an 18 day employment as a deck and engine yeoman aboard the respondent's liner the S/S "ATLANTIC", during December 1962–January 1963. These claims total $200.31. The libellant further seeks a sum equal to one month's compensation, or $461.76, pursuant to 46 U.S.C. § 594, contending that he was wrongfully discharged by the respondent before one month's wages were earned. Finally, the libellant invokes the penalty provisions of 46 U.S.C. § 596, claiming that his overtime wages have been with-held by the respondent "without sufficient cause" and that he is entitled to an amount equal to twice his daily wage for each day since January 4, 1963, when payment was due. At a rate of $14.89 per day, such penalty wages would exceed $50,000.

In a cross-libel, the company seeks damages in the amount of $219.42 which it claims to have expended in overtime wages to others who were required to do the libellant's work for him.

On December 17, 1962, the libellant applied for and accepted employment as a "relief" "deck and engine yeoman" on board the respondent's vessel, the S/S "ATLANTIC", which sailed from the Port of New York on December 19, 1962. Although his seaman's card bore a United States Coast Guard endorsement permitting the libellant to work as a yeoman, he had never before held that position.

The terms and conditions of the libellant's employment were contained in the shipping articles signed by the libellant and the Master of the S/S "ATLANTIC", and in the Working Agreement between the libellant's Union, the National Maritime Union and the respondent.

The libellant's wages were fixed at $461.76 per month and the articles provided that should a seaman prove incompetent to perform the duties of his position, "his wages shall be reduced in proportion to his competency * * *."

The Working Agreement provided that "Overtime shall in no case be worked without the prior authorization of the Master or persons acting by authority of the Master." (Working Agreement, Article IV, Section 2.)

### 1. Claim for Overtime

The libellant worked during the voyage under the direction of the Chief Mate and the Chief Engineer.

The libellant testified that his duties as deck and engine yeoman required that he do all the clerical and typing work of both the deck and engine departments of the S/S "ATLANTIC", and that he could not complete this work during his

regular working hours. He testified that in consequence he worked 73 hours overtime during the eighteen days of his employment on the S/S "ATLANTIC", and that he received prior authorization to perform such overtime work from the Chief Engineer with respect to engineering matters and from the Chief Mate as to other matters.

He further testified that at the close of each day, he submitted "chits" for approval by his superiors, representing that day's overtime hours. At the trial, the libellant produced carbon copies of these chits; in several instances they were altered by handwritten annotations of hours worked or by evident erasures of matter originally set forth. The libellant admitted that the alterations were his but claimed that their purpose was to clarify the carbon imprint. The so-called copies of chits are not regular on their face, and no credible evidence was adduced to support their regularity. The libellant admitted that the chits which he allegedly turned in were not signed or approved by any representative of the respondent. At no time during the voyage did libellant complain of the absence of approval of his chits. As yeoman, it was the libellant's function to keep time records of crewmen in the deck and engine departments and to reflect the overtime chits on summary sheets. Libellant's name was not reflected as one of those entitled to overtime listed on the summary sheets.

There was no credible evidence that the libellant's overtime work, if any, was authorized in advance as required by the Working Agreement. Although the libellant testified it was understood between himself and his superiors that he was to work overtime during the week and to render services on Saturdays and Sundays which would be treated as overtime work, the Chief Engineer denied this, and testified that at no time did he authorize the libellant to work overtime. The Chief Engineer further testified that he himself did work ordinarily assigned to the yeoman since the required work was not completed by the libellant

during regular working hours and the libellant did not keep the required records on a current basis. Substantial entries in the engine room's smooth logbook were in the Chief Engineer's rather than the libellant's handwriting, although the chits would indicate that the libellant claims to have rendered overtime services for making such entries.

The Chief Mate testified that prior to December 24, 1962 the libellant had not been authorized to do any overtime work and on that day he specifically instructed the libellant not to perform any work on overtime thereafter. The Chief Mate admitted that the yeoman's duties were ordinarily sufficient in volume so as to require overtime work but when he found that libellant was behind in his work to an unsatisfactory degree, rather than authorizing the libellant's overtime, he reassigned the libellant's duties to the ship's pursers to bring the work up-to-date. Accordingly, the pursers as well as others on the staff undertook and performed duties normally the function of the yeoman. The pursers were paid overtime wages for this work which involved between 60 and 70 hours of extra services.

The Chief Mate testified libellant had not turned in any overtime chits for approval or otherwise. The Chief Engineer testified similarly, that he never saw any of the libellant's overtime chits although he would have ordinarily received chits relating to overtime work in the engine department. The Chief Purser in charge of payroll matters testified that no chits from libellant had ever been turned in and that libellant's name did not appear among those listed on summary sheets for overtime services reflected by chits turned in for payroll purposes.

The evidence, including the demeanor evidence as well as the circumstances and probabilities fail to support the claim of the libellant for overtime wages; and the Court resolves the issues of fact and credibility in connection therewith against the libellant and in favor of the respondent. The libellant failed to establish by a fair preponder-

ance of the credible evidence that he was authorized to render overtime services or that he actually rendered overtime services.

## 2. Claims for Wrongful Dismissal and Transportation Costs

During the voyage, a "Report of Dismissal—Crew Member" was prepared and signed by the Chief Mate and by the Chief Engineer for the dismissal of the libellant which set forth as reasons therefor: "Incompetency in performance of duties", "general attitude toward crew or passengers" and "insubordination".

The report stated that:

"This man has been unsatisfactory in the performance of his duties and attitude to his fellow workers. He was unable to do any of his work. It was necessary to pay overtime to the pursers to do all of the * * * [work] that is normally the yeoman's job. During the voyage the engine storekeeper requested to be put in another room as it was impossible to live in the same room with the * * * [libellant]. His dining privilege in the passenger dining room had to be taken away from him as he could not get along with the waiter assigned to the staff. On December 31, the Chief Officer took away the keys of the office and took the man off duty as there was no work being performed by him."

The evidence of the respondent tended generally to substantiate this report. The libellant was described as argumentative and insubordinate, unable to get along with his fellow crewmen and unwilling to obey his superiors. He could not keep current in the duties of his office.

The libellant attempted to explain or denied each of the accusations against him. With respect to his ability as a clerk-typist, he testified that he has worked in that capacity on land, that he could type between 60 and 80 words per minute and that he has received letters of commendation from former employers. He stated that his sole act of insubordination consisted in changing the word "liqueurs" to "liquors" in a notice he had been ordered to type by the Chief Mate, and that he had received authorization for the change from one of the pursers.

He testified that he could not get along well with his roommate because the latter could not mind his own business, and that his privilege of eating in the passenger dining room had been revoked solely because he requested a mess hand to serve him while the latter was cleaning up, and that he was only demanding his rights.

The libellant testified that he voluntarily gave up the keys to his office prior to the end of the voyage because there was no further work to do, and that his roommate had requested a change of cabin because the latter could not mind his own business and had been offended when the libellant prevented him from prying into his personal affairs.

It should be noted that aboard a ship, as matter of discipline, it is required of crewmen that they obey, without question, orders of superiors. That leeway of questioning which is permissible in other areas of employment might well be cause for dismissal at sea. Disputes among crewmen tend to disrupt the smooth functioning of a ship, and where two such incidents occur within an eighteen-day period, the participant in both may be dismissed without inquiry into who was initially responsible. Finally, the log-book entries in the Chief Mate's handwriting demonstrate that the libellant was not current in his work.

■ The libellant has failed to establish by a preponderance of the credible evidence that he was dismissed without sufficient cause.

## 3. Transportation

■ Although the voyage of the S/S "ATLANTIC" was scheduled to begin and end in New York, a longshoremen's strike in that city resulted in a termination of the voyage in Baltimore, Maryland. At Baltimore the crew left the ship in sympathy with the strike and returned by chartered bus to New York. The

libellant was paid his full proportionate share of wages to that point. Thus, although a letter of dismissal had been prepared, the libellant received (with the exception of the presently disputed overtime) no smaller proportion of his wages than any other crew member.

Nevertheless, the libellant contends that he is entitled to be paid an amount equal to first-class transportation from Baltimore to New York, or $20.00. There was no evidence that the libellant was out-of-pocket in that amount by reason of his dismissal.

### 4. The Pay-Off

The crew was paid off before the United States Shipping Commissioner in Baltimore on January 4, 1963. Four or five hours prior to pay-off the libellant received a voucher setting forth the details of the pay he was to receive. At the pay-off the libellant signed articles before the Shipping Commissioner duplicating the itemized pay voucher delivered to him earlier and he acknowledged in writing his receipt of his proportionate share of monthly wages, which came to $286.56, less deductions. The articles which he signed contained the following mutual release:

> "We, the undersigned seamen, do hereby, each one for himself by our signatures herewith given in consideration of settlements made before the shipping commissioner, release the Master and owners from all claims for wages in respect of this voyage or engagement, and I, the Master, do also release each of the undersigned seamen from all claims in consideration of this release signed by them."

■■ The libellant testified that he did not realize that he had signed a release. This claim is not credible in view of, among other factors, his education, lengthy experience in working on ships and his status as a yeoman. His further contention that he was unaware that he had been dismissed is at odds with his contentions in the pretrial proceedings herein.

■ Irrespective of the merits of the libellant's claims, which are specifically resolved against the libellant, the release operates as a complete defense to those claims.

"* * * while 'one who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman' (Harmon v. United States, 5 Cir., 59 F.2d 372, at page 373), nevertheless a release fairly entered into and fairly safeguarding the rights of the seaman should be sustained. Any other result would be no kindness to the seaman, for it would make all settlements dangerous from the employer's standpoint and thus tend to force the seaman more regularly into courts of admiralty. Even if a seaman is the court's ward, the court cannot be always at hand to watch over him * * *." The S/S "STANDARD" Bonici v. Standard Oil Co. of New Jersey, 103 F.2d 437, 438–439 (2d Cir. 1939).

■ It has been held that a seaman's release, executed in the presence of and attested to by a United States Shipping Commissioner, in the absence of a showing of fraud or coercion, is valid. Jensen v. Barber S.S. Lines, 110 Misc. 632, 180 N.Y.S. 754 (Mun.Ct., Man. 1st Dist. 1920). Although this Court has the power to set aside the release for good cause shown "as justice shall require" (46 U.S.C. § 597), there has been no showing that the will of the libellant was overborne or that unfair advantage was taken of him.

■ In the case at bar, there was consideration for the libellant's release, in that the Company's claim for overtime paid to others as a result of the libellant's incompetence is similarly barred by the Master's release of the libellant.

### 5. Failure to Exhaust Union Grievance Procedures

The libellant's claims for overtime pay, transportation costs and wrongful dismissal are barred for yet another reason.

The Working Agreement between the National Maritime Union and the respondent Company provided that all wage disputes of Union members be directed in the first instance to the Union representative on board the ship, that they be presented before the Shipping Commissioner at a "beef session" at which representatives of the Union and the Company are present, and that, if necessary, a dispute be submitted to arbitration. (Working Agreement, Articles II and XII.) The employee does not, in the first instance, have recourse to the courts to settle disputes with his employer.

The libellant testified that following pay-off he brought his grievance concerning overtime to the attention of the Union "patrolman" on board the S/S "ATLANTIC", but that subsequently the grievance was not prosecuted "effectively" by the Union. He testified that he received a "run-around".

There was no evidence that in failing to process the libellant's grievance the Union acted in a wrongful manner, or that the Union breached its duty to the libellant of fair representation. (See, Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).) A complaint filed by the libellant against the Union for failure to exhaust grievances was voluntarily discontinued in 1964.

■ In the absence of evidence tending to show that the Union acted in bad faith or that it abused its discretion with respect to the processing of libellant's grievances, the libellant is precluded from seeking redress in the courts where the grievance procedures provided for by contract have not been pursued.

### 6. Claim for Penalty Wages

46 U.S.C. § 596 provides that:

"Every master or owner who refuses or neglects to make payment [to a seaman within two days after termination of the agreement under which the seaman is shipped] *without sufficient cause* shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed * * *." (emphasis added.)

■ The libellant invokes the provisions of § 596 and seeks to recover twice his daily wages of $14.89, for each day from January 4, 1963 to the present. In view of this Court's finding that the claims sued on are without merit, it cannot be said that the Company neglected to pay the libellant overtime wages or transportation costs without sufficient cause.

Even if, however, the libellant were entitled to compensation claimed herein, he would not be entitled to recover penalty wages. In McCrea v. United States, 294 U.S. 23, 55 S.Ct. 291, 79 L.Ed. 735 (1935), the Supreme Court stated that " * * * the words 'without sufficient cause' must be taken to mean something more than the absence of valid defenses to the claim for wages * * *. The statute * * * confers no right to recover double wages where the delay in payment of wages due was not in some sense arbitrary, wilful or unreasonable." See also, Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696 (1930).

The libellant offered in evidence a document stating that he had claimed overtime wages at the time of the "pay-off" but these had been refused on the ground that no overtime services had been rendered.

■ If, in fact, wages were due to the libellant, no issue of this was made by the libellant at the time of pay-off. No "beef" with respect to the libellant was submitted to the company by the Union. In view of the Union's failure to process the libellant's alleged grievance, the Company did not act arbitrarily or unreasonably in failing to pay the libellant *sua sponte*.

There was a total absence of evidence that the Company deliberately failed to pay the libellant overtime wages, knowing them to be owing.

In accordance with these findings and opinion, both the libel and the counter-libel are dismissed, without costs.

The foregoing shall constitute the findings required by Rule 52(a), Fed.R. Civ.P.

So ordered.