**Earl B. LEWIS et al.,
Plaintiffs-Appellees,**

v.

**TEXACO INC., Defendant-Appellant.**

**No. 233, Docket 75–7233.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 24, 1975.

Decided Dec. 9, 1975.

James S. McMahon, Jr., New York City (Bigham Englar Jones & Houston, New York City, on the brief), for defendant-appellant.

Ned R. Phillips, New York City (Abraham E. Freedman, New York City, on the brief), for plaintiffs-appellees.

Before MOORE, FEINBERG and VAN GRAAFEILAND, Circuit Judges.

FEINBERG, Circuit Judge:

This is an action by 32 seamen for statutory remedies arising out of a breach of shipping articles by their employer, defendant Texaco Inc. After a non-jury trial in the United States District Court for the Southern District of New York, Judge Constance Baker Motley, in an opinion reported at 1975 A.M.C. 61 (S.D.N.Y.1974), awarded plaintiffs an amount equal to one month's wages under 46 U.S.C. § 594, prejudgment interest and counsel fees, but denied claims under 46 U.S.C. § 596 for two days' wages for each day payment was delayed. Texaco appeals. We affirm except as to the grant of counsel fees; on that issue, we remand for further consideration.

I

The relevant facts are few. On January 6, 1971, plaintiffs signed foreign articles with appellant, which called for a voyage on its ship from Port Everglades, Florida to

> One or more ports in the Gulf and/or Caribbean and Panama and thence to one or more ports on the Pacific Coast of the Continental United States, ex-

clusive of Hawaii and Alaska, to a final port of discharge on the Pacific Coast of the United States, for a period of time not exceeding (90) days. The vessel did not complete this voyage, but instead was prematurely directed back to the east coast of the United States. On January 21, 1971, the foreign articles were terminated, ending the voyage, and plaintiff seamen were paid their earned wages for the 16-day period of the voyage. All but six of the plaintiffs then remained on the vessel on a coastwise voyage.

The controversy arises out of plaintiffs' claim for "a sum equal in amount to one month's wages" under 46 U.S.C. § 594, which provides:

> Any seaman who has signed an agreement and is afterward discharged before the commencement of the voyage or before one month's wages are earned, without fault on his part justifying such discharge, and without his consent, shall be entitled to receive from the master or owner, in addition to any wages he may have earned, a sum equal in amount to one month's wages as compensation, and may, on adducing evidence satisfactory to the court hearing the case, of having been improperly discharged, recover such compensation as if it were wages duly earned.

In the district court, Texaco claimed that plaintiffs were not entitled to recover, even though they had been "discharged . . . before one month's wages" had been "earned," because they had consented to the discharge, because they had waived their statutory right by remaining in defendant's employ, and because application of the statute on these facts was unconstitutional since plaintiffs had in fact suffered no damage. Texaco relied heavily on an allegedly binding release signed by plaintiffs, when signing off the articles on January 21, 1971. At that time, each plaintiff affixed his signature in a column at the

end of the articles bearing the following language at the top:

> We the undersigned seamen do hereby, each one for himself by our signatures herewith given in consideration of settlements made before the shipping commissioner, release the Master and owners from all claims for wages in respect of this voyage or engagement, and I, the Master, do also release each of the undersigned seamen from all claims, in consideration of this release signed by them.

In addition, "M/C," which stands for mutual consent, was marked as the cause of the discharge on the same page of the articles.

After receiving the testimony of six witnesses,[1] Judge Motley held that plaintiffs were not barred by this release. First, under *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239 (1942), the burden was on Texaco to show that plaintiffs had had a "full understanding" of their rights under section 594 before releasing them, and defendant had not met this burden. Second, under 46 U.S.C. § 597, reproduced in the margin,[2] "good cause" had been shown for setting aside "the ostensible mutual consent" to termination of the voyage. The judge rejected Texaco's other arguments and concluded that plaintiffs were entitled to "a sum equal in amount to one month's wages," prejudgment interest and counsel fees in the sum of $5,000.

In this court, appellant first argues that the release and mutual consent contained in the shipping articles bars plaintiffs' claims. Conceding that such cases as *Garrett,* supra, and *S. S. "Standard Bonici" v. Standard Oil Co. of New Jersey,* 103 F.2d 437 (2d Cir. 1937), require the party relying on a seaman's release to show the requisite state of mind, appellant argues that these cases do not apply here because "this is not a shipowner's release at all but a Govern-

---

1. One witness testified before the judge; portions of the depositions of the other five were read into evidence.

2. In pertinent part, § 597 provides:

    . . . And when the voyage is ended every such seaman shall be entitled to the re-

ment release."[3] Texaco points out that the release was not taken by the shipowner but by a United States Shipping Commissioner present at the sign-off and that by its very terms the document releases not only the shipowner but also the seamen. According to appellant, therefore, placing the burden upon it to show plaintiffs' state of mind was improper and the release was prima facie valid in the absence of fraud or coercion, as to which plaintiffs offered no proof.

We are not sure whether it is fruitful to consider release and consent as separate concepts here. Section 594 allows the seaman's "consent" to be put in issue as a defense to his claim and the release relied on by Texaco is offered as evidence of consent. The issue ultimately comes down to whether Texaco has the burden to show the seamen's knowledge and informed acquiescence. With that in mind, we turn to Texaco's argument that general concepts regarding seamen's releases do not apply here.

The greater weight of authority does not confine the general rule regarding seamen's releases to personal injury claims taken "by a shipowner's claims man in the shipowner's office," as appellant claims.[4] The sweep of the language in *Garrett* is so broad and the solicitude for seamen so plain that an argument for limiting the traditional rule in admiralty regarding seamen's releases cannot be sustained. The discussion of releases

in *Garrett* emphasizes "Our historic national policy, both legislative and judicial," which has "generally sought to safeguard seamen's rights," including "wage contracts," by "providing summary remedies for their breach." 317 U.S. at 246, 63 S.Ct. at 251. The historic depth of the roots of this policy is reflected in the Court's extensive quotation from Mr. Justice Story's opinion in *Harden v. Gordon*, 11 Fed.Cas. 480, 485 (Cir.Ct.Me.1823), which enunciated the basic principles applied in *Garrett*.[5] The opinion in *Garrett* also refers specifically to the codification of the liberal seamen's release rule in 46 U.S.C. § 597, which is quoted in note 2 supra, as an example of the general "policy" of protecting seamen against "unjust and unreasonable" contracts, 317 U.S. at 246–47, 63 S.Ct. 246.

Finally, the Court in *Garrett* also relied on *Harmon v. United States*, 59 F.2d 372, 373 (5th Cir. 1932), quoting the following from that opinion:

One who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman . . . .

317 U.S. at 248, 63 S.Ct. at 252. It is notable that in *Harmon*, the Fifth Circuit also observed that

This rule of course is most rigidly applied to clauses in shipping articles

---

mainder of the wages which shall be then due him . . . *Provided further*, That notwithstanding any release signed by any seaman under section 644 of this title any court having jurisdiction may upon good cause shown set aside such release and take such action as justice shall require . . . .

Section 644, referred to above, provides various rules for "the settlement of wages" in the presence of a Coast Guard official.

**3.** Brief of Defendant-Appellant Texaco, Inc., at 11

**4.** Id.

**5.** At 317 U.S. 246–47, 63 S.Ct. 251, the Court quoted with approval the following from *Harden v. Gordon*:

They [seamen] are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract,

they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and *cestuis que trustent* with their trustees. . . . If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that *pro tanto* the bargain ought to be set aside as inequitable. . . . And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen.

purporting to release rights which seamen have, and to releases of claims for wages.

59 F.2d at 373.

■ We therefore believe that there is no basis for treating a seaman's release of a wage claim differently from his release of a personal injury claim, and that the test remains the same regardless of the nature of the claim released or the place where, or before whom, the release is signed. See also, e. g., *Young v. Alcoa Corsair*, 186 F.Supp. 476 (S.D.Ala.1960); *Gonzales v. Isthmian S. S. Co.*, 1958 A.M.C. 97 (E.D.Pa.1957); *O'Connor v. Panama Canal Co.*, 1952 A.M.C. 1575 (N.Y.Mun.Ct.); 1 Norris, The Law of Seamen, §§ 371, 501–21. It is true that the effect of a release on the precise seaman's wage claim made here under section 594 is rarely discussed,[6] but we see no reason for a different standard to apply in this situation. Appellant cites *Jones v. American Export Isbrandtsen Lines, Inc.*, 285 F.Supp. 345 (S.D.N.Y. 1968), for the proposition that the releases here were valid absent fraud or coercion. In *Jones*, the court did not discuss the *Garrett* line of authority, and the case is factually distinguishable because the employer there actually had a claim against the seaman which was given up in the mutual release. In any event, to the extent that the case stands for the proposition that the considerations referred to in *Garrett* do not apply to a seaman's release of a claim under section 594, we would not agree.

■ Turning to those considerations, the district court found that the shipping articles to which plaintiffs fixed their signatures did not mention their rights under section 594, that the shipping commissioner did not advise them of such rights and directed their attention only to the basic wage due and that plaintiffs were not made fully aware of their section 594 rights until they consulted their attorney two weeks later. On the record before us, these findings were not clearly erroneous. In addition, plaintiffs were paid at sign-off only wages concededly due, making pertinent the caution in *Garrett* that "The adequacy of the consideration and the nature of the . . . legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding." 317 U.S. at 248, 63 S.Ct. at 252. We hold that the district judge committed no error in concluding under *Garrett* that the release did not bar plaintiffs' claims here.[7]

■ Finally, Judge Motley also independently applied the standard of 46 U.S.C. § 597, see note 2 supra, in setting aside the "ostensible mutual consent." See *Brown v. United States*, 283 F. 425 (N.D.Cal.1922). We have already indicated that this standard and the test to be applied to seamen's releases generally are substantially the same. We do not agree with Texaco that the release can be set aside under this section only if plaintiffs can show fraud or coercion. *Pacific Mail S. S. Co. v. Lucas*, 258 U.S. 266, 42 S.Ct. 308, 66 L.Ed. 614 (1922); *Cox v. Lykes*, 237 N.Y. 376, 143 N.E. 226 (1924). Section 597 allows a district court to set aside the release "for good cause shown . . . and take such action as justice shall require." The district court concluded that on these facts it was unfair to bar plaintiffs' claim and we will not disturb that decision.

---

**6.** *Brown v. United States*, 283 F. 425 (N.D.Cal. 1922).

**7.** Relying primarily on the language of the release and a letter sent by three of the plaintiffs, our dissenting brother believes that Texaco "met its burden." However, the release does not mention any claim under § 594. And the letter makes clear, in the sentence immediately following the portion quoted in the dissent, that the union representatives were unsure of plaintiffs' rights, and "would consult with the union attorneys about this beef." In addition, there was testimony from the plaintiffs, relied on by Judge Motley, that they were not informed that signing the releases would give up § 594 rights, nor did they intend to do so, nor did they comprehend that this would be the effect of their signatures. Under the circumstances, the decision as to whether Texaco had "met its burden" was clearly one for the trier of fact.

## II

■ We turn now to appellant's remaining arguments. It is not clear whether appellant still claims that by immediately signing up for the coastwise voyage, plaintiffs waived their rights under section 594.[8] On the assumption that the point is still pressed, we note our agreement with the analysis of Judge Thomsen in *Lunquist v. S. S. Seatrain Maryland,* 359 F.Supp. 663, 665–66 (D.Md.1973), that to find such a waiver there must be "an intentional relinquishment" of the section 594, or analogous, right. Since Judge Motley found that plaintiffs were not fully informed of their rights under that statute, signing on for a new voyage was not a waiver. See also *Newton v. Gulf Oil Corp.,* 180 F.2d 491 (3d Cir.), cert. denied, 340 U.S. 814, 71 S.Ct. 42, 95 L.Ed. 598 (1950); *Neil v. Gulf Oil Corp.,* 101 F.Supp. 347 (E.D.Pa.1951).

■ Appellant does clearly argue, however, that the immediate signing on for a new voyage demonstrates that section 594, if applied here, is unconstitutional. The theory is that since these plaintiffs suffered no damages, an award under section 594 denies Texaco due process and the equal protection of the laws. The claim is without merit and is adequately discussed in the opinion of the district court.

■ Texaco also claims that the district court unduly restricted discovery by denying its motion to take the depositions of all plaintiffs regarding their "state of mind" at the time of the alleged release and consent. The motion was made long before trial and after Texaco had deposed two plaintiffs. At that time, the judge permitted defendant to depose only the shipping commissioner and the union representative on board ship at the sign-off, but provided that thereafter, "the court will rule on the necessity for taking any further depositions." In the almost two years that followed, defendant failed to ask for fur-

ther depositions until the eve of trial and even then it did not submit a motion. The management of discovery is within the discretion of the trial court. On this record of defendant's dilatoriness, we find no abuse of that discretion.

■ Finally, appellant objects to the award of prejudgment interest and of counsel fees. The former was within the discretion of the district court and, on this record, was unobjectionable. *Lunquist v. S. S. Seatrain Maryland,* supra, 359 F.Supp. at 666; see also *Van Nievelt, Goudriaan Co.'s Stoomvart Maatschappij, N. V. v. Cargo & Tankship Management Corp.,* 421 F.2d 1183, 1185 (2d Cir. 1970). The award of counsel fees, however, requires more discussion. The district court apparently relied on two lines of cases in awarding fees: those in which the success of the party in the lawsuit benefits others in his class, e. g., *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); and those in which the award was predicated on defendant's bad faith, e. g., *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). The district judge also relied upon "the basic purpose of . . . § 594 . . . to aid generally impecunious seamen" to justify an award because otherwise "the average seaman might be forced to forego his legal remedy by reason of the reluctance of competent counsel to undertake such cases."

After the district court's decision, the Supreme Court decided *Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In that case, the Court held unjustified an award of counsel fees to groups that had unsuccessfully attempted to restrain construction of the Alaska pipeline. The Court of Appeals for the District of Columbia Circuit had approved such fees in principle on the theory that the groups had each acted as a "private attorney general" in attempting to vindicate "statutory rights of all citizens." 495 F.2d at 1028–31. The Su-

---

8. This would not apply, of course, to the six plaintiffs who did not sign on for a new voyage.

preme Court reversed, rejecting the "private attorney general" exception to the general American rule refusing to allow attorneys' fees. However, the Court expressly affirmed the continued vitality of *Hall v. Cole,* supra, and *Vaughan v. Atkinson,* supra. 421 U.S. at 258–59, 95 S.Ct. 1612.

Citing *Alyeska* and the Court's earlier decision in *F. D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), appellant claims that the fee award must be set aside. Appellant says that Judge Motley clearly relied on the private attorney general theory in awarding counsel fees because she pointed out that otherwise "the average seaman" might not be able to pursue his legal remedies.

In view of *Alyeska,* we believe that the district court should reconsider the fee award. To the extent the district court relied on the plaintiffs' efforts to aid all "impecunious seamen," the award is at least open to question under *Alyeska.* We are not sure that the district judge did rely on the private attorney general theory, but if she did, that would now be impermissible. Moreover, in view of the explanation of the common benefit line of cases in *F. D. Rich Co.,* 417 U.S. at 130, 94 S.Ct. at 2165, as a "shifting of fees . . . to spread the cost proportionately among the members of the benefited class," see also *Alyeska,* 421 U.S. at 257–58, 95 S.Ct. at 1612, we are not sure that the rationale of *Hall v. Cole,* supra, applies here either. On the other hand, if the district court, relying on *Vaughan v. Atkinson,* supra, would have awarded counsel fees based solely on the recalcitrance of Texaco in failing to pay the sums due plaintiffs here, these questions might not be relevant. Accordingly, we remand the issue of counsel fees to the district court to consider the effect of *Alyeska* and to make clear the basis of the award, if one is appropriate.

Judgment affirmed, except on the issue of counsel fees, as to which the case is remanded.

MOORE, Circuit Judge (concurring and dissenting):

I would reverse on the ground that the seamen's releases bar recovery under § 594. I do not believe that Texaco should have been required to prove state of mind, since the releases were signed in the presence of a Shipping Commissioner and the seamen were represented by a union official who supervised the sign-off procedures and who was also in contact with union headquarters.

However, even if state of mind were properly required to be proven, Texaco met its burden. First, I do not believe that the wording of the release can be interpreted as excluding § 594. The release spoke of "all claims for wages" and did not specifically invoke § 594; however, Boland's testimony clearly demonstrated both that the seamen were well aware of their rights under § 594 and that they regarded § 594 as a claim for wages within their understanding of the word. Given the men's understanding and interpretation of the statute, I think that the term *"all claims for wages" (i. e.,* all claims whether earned through actual man-hours of work or otherwise) encompassed the 30 days' penalty pay provided for in § 594.

Second, these seamen voluntarily and knowingly entrusted the supervision of the sign-off to the union representative, or patrolman, whose very function it was to oversee such procedures. That patrolman Mauricio was not a lawyer is immaterial; he was clearly authorized to represent the men and, moreover, he was probably the most knowledgeable and competent individual to do so. Under the circumstances it is inconceivable to me to claim that the men were "duped"; my conclusion is reinforced by the letter which Boland and several other seamen sent to union headquarters stating that

Patrolman Brother Maurice met this vessel at time of payoff . . . and consulted with Agent S. D. George about whether or not this unlicensed crew of the TEXACO ILLINOIS were entitled to thirty days of penalty pay.

. . . But Brother George gave his opinion that there was no beef and penalty pay would not be possibly payable. (Defendant's Exhibit B at p. 210a)

The testimony regarding the oral protest is inconsistent and unpersuasive. The Shipping Commissioner, presumably disinterested, attested that there was none made; Boland's letter suggests that there was none; and in view of the presence of the union official, and his supervision of the sign-off, it is difficult to believe that, had there been any intention to protest, Mauricio would have neglected to make the necessary and commonly accepted notations on the sign-off articles.

As for the dearth of depositions, I agree that defendant's counsel might have been more persevering. However, since the men obviously delegated Boland and Mauricio to act for them and to express their views, it does not seem unreasonable to determine the men's views from the actions of their chosen representatives. Even seaman Chladek, who stated that he had not even read the release, said unequivocally that the delegates (*i. e.,* Boland, *et al.*) were in complete charge of seamen's meetings, and he apparently did not question their authority to arrange the sign-off or the manner in which it was carried out.

With respect to the award of attorney's fees, I concur in the remand.