RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0083p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

SEDRIC WARD,

> *Plaintiff-Appellee*,

     *v.*

SHELBY COUNTY, TENNESSEE,

> *Defendant-Appellant*.

No. 22-6054

─────────────

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:20-cv-02407—Jon Phipps McCalla, District Judge.

Argued: October 18, 2023

Decided and Filed: April 11, 2024

Before: CLAY, KETHLEDGE, and MATHIS, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** R. Joseph Leibovich, Jasen McCoy Durrence, SHELBY COUNTY ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellant. Thomas Jarrard, LAW OFFICE OF THOMAS JARRARD, PLLC, Spokane, Washington, for Appellee. **ON BRIEF:** R. Joseph Leibovich, Jasen McCoy Durrence, SHELBY COUNTY ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellant. Thomas Jarrard, LAW OFFICE OF THOMAS JARRARD, PLLC, Robert W. Mitchell, Spokane, Washington, SaraEllen Hutchison, LAW OFFICE OF SARAELLEN HUTCHISON, PLLC, Tacoma, Washington, John Paul Schnapper-Casteras, SCHNAPPER-CASTERAS PLLC, Washington, D.C., for Appellee.

The court delivered a PER CURIAM opinion. CLAY, J. (pp. 8–16), delivered a separate dissenting opinion.

_____

**OPINION**

_____

PER CURIAM. Sedric Ward is an Army reservist who worked at the Shelby County Jail. The County fired Ward in 2015, but later entered into a settlement agreement in which, as to his termination, Ward expressly released "any and all claims whatsoever[.]" Yet Ward later brought this suit against the County, asserting a claim under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4301 *et seq.* (USERRA). The question here is whether the settlement agreement was effective to release Ward's claim under the Act. We disagree with the district court's reasoning on that question, so we vacate the court's judgment in favor of Ward.

I.

Ward has been an Army reservist since 1987. In 1998, he began working for the Shelby County Jail, which is run by the Shelby County Sheriff's Office. Like most reservists, Ward often took leave while deployed and to attend drills and training. Some of that leave was paid by the County. In 2013, the County conducted an audit that allegedly revealed potential instances where employees at the jail had taken paid leave of various kinds—medical, military, family— on fraudulent grounds. Ward was not among the employees whose leave was flagged as suspicious in that audit.

The Sheriff's Office asked the General Investigations Bureau to conduct a criminal investigation, which—unlike the audit itself—focused solely on leave taken by servicemember employees. As part of that investigation, Agent Jason Valentine told Ward to produce documents supporting the validity of his paid leave during the past several years. Ward had difficulty retrieving those documents but eventually slid some under Valentine's door. Yet the Bureau later issued a report in which it accused multiple servicemembers, including Ward, of taking fraudulent leave—in Ward's case, allegedly, 36 days' worth.

In November 2014, at the urging of the local district attorney's office, a Tennessee grand jury indicted Ward for theft. He was booked and detained in the same jail in which he worked.

The next day, the Sheriff's Office suspended Ward without pay. The Sheriff's Office then conducted its own investigation, during which Eugenia Sumner demanded that Ward produce—within three days—documents supporting his paid leave during the past several years. Ward could not meet that deadline—he testified that doing so was impossible within the military bureaucracy—and the County fired him. (One of the grounds for his termination was "disobedience" of Sumner's "order" to produce those documents by her deadline.)

In November 2015, Ward provided the district attorney's office with documents substantiating his attendance at military functions on the dates relevant to his indictment. The district attorney's office moved to dismiss the charges against Ward that same day.

Ward later appealed his termination to the Shelby County Civil Service Merit Board. During the pendency of that appeal, the County proposed a settlement: namely, if Ward signed a release of all his claims against the County, he could return to work at the Jail in a probationary capacity for six months and receive three weeks of backpay (worth about $2,500) up front. Ward consulted with a lawyer and signed an "Agreement and General Release" to that effect on August 3, 2016. But a month later—shortly before he was due to return to work—Ward informed the County via email that he had changed his mind and had "decided not to return to the Sheriff's office."

There matters stood for almost four years, until June 2020, when Ward brought this suit against the County. The parties later filed cross-motions for summary judgment on the question whether Ward had released his USERRA claim in the settlement agreement. The district court denied the County's motion on that ground and granted Ward's, asserting that the release's scope—namely, "any and all claims whatsoever"—did not reach his USERRA claim. The parties thereafter went to trial, where the jury found in Ward's favor. The district court eventually entered a judgment ordering the County to pay Ward more than $1.5 million. This appeal followed.

II.

The County argues that it was entitled to summary judgment on the ground that Ward released his claim when he agreed to the August 2016 settlement. We review de novo the district

court's denial of summary judgment on that ground.  *Levine v. DeJoy*, 64 F.4th 789, 796 (6th Cir. 2023).

"Federal law controls the validity of a release of a federal cause of action."  *McClellan v. Midwest Machining, Inc.*, 900 F.3d 297, 302-03 (6th Cir. 2018) (quotation marks omitted).  Here, the first question is whether Ward's USERRA claim fell within the scope of the release in the 2016 agreement.  We interpret that agreement according to its plain terms.  *See Nicklin v. Henderson*, 352 F.3d 1077, 1081 (6th Cir. 2003).  The release provision stated in full:

> In consideration for the agreement as set forth in Paragraph 1 and 2 above, Ward agrees: that he will be on probation for 6 months immediately following his re-instatement; to withdraw his appeal of his April 7, 2015 termination before the Shelby County Civil Service Merit Board; and to release the SCSO and its officers, directors, and employees, from any and all claims whatsoever, both known and unknown, both before the Board and before any local, state, or federal agency or court, arising out of his termination from employment on April 7, 2015 and his probation and permanent assignment pursuant to this agreement.

The relevant language here is that Ward agreed to release "*any and all claims whatsoever*" as to his termination.  Those words speak for themselves: to know that the release applied to Ward's USERRA claim, one needed to know only that it was a claim.

The district court was mistaken to conclude otherwise.  The court reasoned that, since the release did not call out Ward's USERRA claim specifically, the release did not apply to it.  But the law does not require contracting parties to enumerate, one by one, all the objects they intend a particular clause to reach.  That kind of requirement would generate litigation rather than prevent it—by opening the door to disputes later about whether an item was described clearly enough, for example, or about circumstances not expressly foreseen at the time of signing.  When the parties intend to settle "any and all claims," rather, the law allows them to say precisely that.  Parties agree every day to define their respective rights and duties in terms that are comprehensive, plain, and indeed often redundant.  A great deal of legal order—in matters that never darken a courthouse door—depends on those agreements being interpreted by their terms.  That is how the release provision should have been interpreted here.

The district court also cited an opinion from this court as support for the conclusion that Ward's USERRA claim fell outside the scope of his release.  Specifically, in *Wysocki v. IBM*

*Corporation*, 607 F.3d 1102 (6th Cir. 2010), the parties disputed whether a release agreement applied to the plaintiff's claim. This is how we described the provision at issue there:

> The language of the Release is broad and, although it did not specifically refer to USERRA by name, it states that Wysocki waives "all claims, demands, actions or liabilities he might have against IBM of whatever kind," and includes within its scope "any other federal, state or local law dealing with discrimination in employment including, but not limited to discrimination based on . . . veteran status."

*Id*. at 1104 (cleaned up). Later in the opinion, we again referred to the "veteran status" language in concluding that the release was "clear and unambiguous[.]" *Id*. at 1108.

From that discussion, the district court's gloss was that the "veteran status" language in *Wysocki* "was crucial to" our decision there. But that reasoning too was mistaken. Releases routinely make their point three or four times rather than once. That in *Wysocki* the court chose to highlight the term "veteran status"—among all the belts and suspenders the release employed there—did not make that term magic words necessary for release of a USERRA claim. "The facts of a particular case should not be mistaken for its rule." *United States ex rel. Owsley v. Fazzi Assocs., Inc.*, 16 F.4th 192, 197 (6th Cir. 2021) (brackets omitted). Nor did the absence of that term create any ambiguity here. The terms of Ward's release agreement patently encompassed his USERRA claim.

But that does not mean his release was necessarily effective to release that claim. For USERRA itself imposes a second requirement for release of a claim under the Act. Specifically, as applied to a settlement agreement, the Act requires that the agreement "establish[]" rights that are "more beneficial" for the servicemember than the ones he gives up. The Act's relevant provisions state in full:

> (a) Nothing in this chapter shall supersede, nullify or diminish any Federal or State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that establishes a right or benefit that is more beneficial to, or is in addition to, a right or benefit provided for such person in this chapter.

> (b) This chapter supersedes any State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including

the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit.

38 U.S.C. § 4302.

The district court found this requirement unmet because, the court said, "three weeks of back-pay and a reinstatement with probation is objectively less beneficial than Plaintiff's rights under USERRA[.]" But § 4302 does not make the courts guardians of servicemembers who choose to settle their USERRA claims. To the contrary, we said in *Wysocki*, servicemembers can "waive their USERRA rights without unnecessary court interference, *if they believe* that the consideration they will receive . . . is more beneficial than pursuing their rights through the courts[.]" 607 F.3d at 1108 (emphasis added). An individual servicemember knows better than the courts do whether the certainty of a lump-sum payment up front, for example, is "more beneficial" to him than the possibility of a larger recovery later. Relatedly, a servicemember's ability to settle a USERRA claim "is both valuable and beneficial[.]" *Id*. And that ability would be diminished if not eliminated if the servicemember's decision was subject to judicial review after the fact.

Ward, for his part, argues that his settlement agreement was not "more beneficial" than his USERRA claim because he received more on that claim after trial than he would have under the agreement. But whether an agreement is more beneficial to a servicemember than the released claim, for purposes of § 4302, cannot depend on events occurring after the agreement is executed. As a matter of contract law generally, the parties' respective rights and duties are fixed at the time of contracting. *See, e.g.*, *Adams v. Philip Morris*, *Inc.*, 67 F.3d 580, 585 (6th Cir. 1995) (scope of a release is evaluated based on the parties' intent at time of signing); *Ellis v. Pauline S. Sprouse Residuary Tr.*, 280 S.W.3d 806, 814 (Tenn. 2009) (after parties sign, courts cannot alter contractual obligations because contract was burdensome or unwise); 11 Williston on Contracts § 30:2 (4th ed.) (a cardinal rule of contract interpretation is that intent is ascertained as of the time when parties signed). And the decision whether to enter into a settlement agreement, in particular, always involves an assessment of potentialities. Nobody would settle a USERRA claim with a servicemember if he could proceed to litigate the claim and then invalidate the agreement if he fared better in the litigation than in the settlement itself. Ward's

argument would help him in this case, but harm nearly everyone else covered by USERRA—by denying them the ability to settle their USERRA claims.

Thus, whether a particular settlement agreement provides greater benefits than a USERRA claim is for the servicemember to decide. To satisfy § 4302(a), however, the servicemember must make a considered judgment that the agreement is more beneficial to him than his USERRA claim is. Of course—absent "evidence of mistake, incapacity, fraud, misrepresentation, unconscionability, or duress[,]" *Wysocki*, 607 F.3d at 1108—that a servicemember chose to enter into a settlement agreement can be important evidence that he thought the agreement was worth more to him than the claim. But that determination must depend on the totality of the circumstances, not on the fact of the agreement alone. Here, those circumstances included that Ward was aware of his USERRA claim and represented by counsel when he entered into the settlement agreement. But Ward also testified that the agreement was presented to him on a "take it or leave it" basis, potentially akin to an adhesion contract; and he testified that he had been out of work for 18 months when he entered into it. On this record, a reasonable jury could find that Ward's decision to enter into the agreement reflected a considered decision on his part, or instead that it reflected only desperation. The issue whether Ward believed benefits from the settlement agreement outweighed his USERRA claim is therefore one for a jury to decide.

\* \* \*

The district court's judgment is vacated, and the case is remanded for proceedings consistent with this opinion.

———————————

## DISSENT

———————————

CLAY, Circuit Judge, dissenting.  Sedric Ward, an army reservist and former employee of Shelby County, was the subject of criminal and internal investigations that unlawfully targeted service members, but not other county employees, for allegedly misusing their paid leave time. Based on these investigations, Ward was fired from his employment with Shelby County and was criminally indicted for theft of leave time from the county, although his criminal charges were later dismissed.  Ward then brought this suit, arguing that the targeted nature of the investigations violated his rights under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq.*

After his suit survived the motion to dismiss stage and the summary judgment stage, a jury held for Ward, concluding that Shelby County's investigations discriminated against service members in violation of USERRA and culminating in a $1,570,035.18 award.  The jury award reveals that Ward was discriminated against and would not have been fired but for this discrimination, for which he is entitled to well over a million dollars, including for the loss of his wages and pension.  But the majority would give Shelby County a second bite at the apple.  It undoes the jury's determination and remands, permitting a new jury to determine whether the release signed by Ward waived his USERRA rights.[1]  It is deplorable that the parties will have to return to court, attempt to gather all their witnesses once more, and expend considerable resources to unnecessarily litigate this issue.  I therefore respectfully dissent.

To prevail on the defense of waiver against a USERRA claim, a defendant must first demonstrate that the plaintiff waived his or her USERRA rights through clear and unambiguous action.  *See Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1108 (6th Cir. 2010).  The defendant must then show that in exchange for the waiver, the plaintiff received a right or benefit that is "more beneficial to, or is in addition to," the plaintiff's rights under USERRA.  *Id.* at 1107 (quoting 38 U.S.C. § 4302(a)).  With respect to the requirement of a clear and unambiguous

---

[1]The issue of waiver was previously decided by the district court as a matter of law prior to trial.

waiver, the majority opinion errs by applying ordinary contract principles to a statute extraordinarily protective of service members. Neither USERRA, nor its legislative history, nor other comparable statutes support its conclusion. And with respect to the requirement that a waiver must be more beneficial to or in addition to a plaintiff's USERRA rights, the majority opinion wrongly concludes that the service member's subjective judgment about the waiver is controlling.

I.

First, there is the statute's requirement that a plaintiff must waive his or her USERRA rights through "clear and unambiguous action." *See Wysocki*, 607 F.3d at 1108. According to the majority opinion, Ward waived his USERRA rights through clear and unambiguous action because the 2016 release he signed applied to "any and all claims whatsoever" against Shelby County, thereby covering claims based on USERRA. Majority Op. at 4 (citing Waiver, R. 1-1, Page ID #31).

But USERRA demands something more than such a rote abandonment of a service member's rights. That is obvious from USERRA's purpose and legislative history, which is where we must begin because USERRA's text is silent on the scope of waivers. *See In re Corrin*, 849 F.3d 653, 657 (6th Cir. 2017). In 1994, USERRA established "the most expansive protection[s] to servicemembers yet enacted." *See Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 429 (9th Cir. 2023) (quoting *Travers v. Fed. Express Corp.*, 8 F.4th 198, 201 (3d Cir. 2021)). These protections, which are focused on service members' employment and re-employment rights, sought to encourage the pursuit of non-career military service and combat workforce discrimination. *Id.* Insofar as any ambiguities remained about the wide reach of USERRA's protections, Congress made clear that "[USERRA] is to be 'liberally construed'" in favor of the service members whom it seeks to protect. H.R. Rep. No. 103-65, pt. 1, at 19 (1993); *see* S. Rep. No. 103-158, at 40 (1993) (stating the same).

On the particular topic of waiver, Congress underscored USERRA's protective nature. While the House Report acknowledged that individuals could waive their rights under USERRA, it made clear that waivers are disfavored. *See* H.R. Rep. No. 103-65, pt. 1, at 20 (1993).

"Because of the remedial purposes of [USERRA]," the House cautioned that any waivers of USERRA rights were invalid unless they were "unequivocal," "specific," "clear, convincing," and "not under duress." *Id.*

The majority opinion wholly disregards USERRA's purpose and legislative history by concluding that a general release of "any and all claims" is enough, without further evidence in the record, to validly waive a USERRA claim. But a general release may fail to put an individual like Ward on notice that he is relinquishing specific statutory rights. *See Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 110 F.3d 431, 441 (7th Cir. 1997). Because Congress expressed a heightened concern over the waiver of USERRA rights—warning, for example, that such waivers must be "unequivocal," "specific," and "convincing," *see* H.R. Rep. No. 103-65, pt. 1, at 20 (1993)—a boilerplate waiver of "any and all claims" is not enough, by itself, to do away with USERRA's expansive protections.

In other settings involving heightened requirements for waiver, courts have routinely looked to the totality of the circumstances to determine whether a plaintiff would have known that a general release waived specific statutory protections. *See, e.g.*, *Lewis v. Texaco Inc.*, 527 F.2d 921, 923–25 (2d Cir. 1975) (holding that a general release of a ship owner "from all claims for wages" did not cover seamen's federal statutory rights because nothing in the record established that the seamen were specifically aware that the general release covered these rights); *Hoffman v. Lloyd*, 572 F.3d 999, 1001–03 (9th Cir. 2009) (concluding that because California's Home Equity Sales Contract Act required releases to be knowing and intelligent, a general release did not waive the plaintiff's statutory rights without evidence that the plaintiff was aware of his specific rights under the statute upon signing); *see also Pierce*, 110 F.3d at 441 ("[A] company's conditioning of all severance packages upon the signing of a general release of any and all claims cannot defeat the inquiry in a particular case into whether the waiver of statutory rights was knowing . . . ."). *Kennedy v. Superior Printing Co.* is an apt illustration. 215 F.3d 650 (6th Cir. 2000). In that case, we noted that for a union to wave its members' statutory rights, any waiver needed to be "clear and unmistakable." *Id.* at 653–54 (quoting *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 80 (1998)). Applying this standard, we concluded that a general arbitration provision in a collective bargaining agreement did not clearly and unmistakably waive

the right to a judicial forum for claims based on the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. *See id.* at 654. The clear and unmistakable standard we applied was based on the principle that "[n]ational labor policy casts a wary eye on claims of waiver of statutorily protected rights." *Gannett Rochester Newspapers v. NLRB*, 988 F.2d 198, 203 (D.C. Cir. 1993). Accordingly, to determine if a waiver was clear and unmistakable, courts could "not infer from a general contractual provision [alone] that the parties intended to waive a statutorily protected right." *Id.* at 202 (quoting *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983)).

The requirement that USERRA waivers must occur through "clear and unambiguous action" undoubtedly resonates with the "clear and unmistakable" standard we applied to unions in *Kennedy*. *See Wysocki*, 607 F.3d at 1108. And similar to the "wary eye" that national labor policy casts on waivers of statutory rights, USERRA's legislative history clearly reveals concerns about waiving USERRA's expansive statutory protections. *See* H.R. Rep. No. 103-65, pt. 1, at 20 (1993).

We must therefore examine general releases purporting to waive USERRA rights more closely. Our case law governing USERRA shows just as much, focusing on the totality of the circumstances, rather than on just the plain meaning of an abbreviated waiver's text, to decide whether a plaintiff waived his or her rights. In *Wysocki v. International Business Machine Corp.*, this Circuit held that a plaintiff clearly and unambiguously waived his USERRA rights by signing a release that covered "all claims . . . of whatever kind" including those based on "veteran status." 607 F.3d at 1104. And rather than focus only on the plain meaning of the release, the Court looked to whether the plaintiff knew that the release applied to his USERRA rights. Based on the release's specific reference to veteran status, the fact that the plaintiff "was encouraged to see a lawyer," and that he "had ample time to consider the Release," it was clear that the plaintiff "understood that the Release eliminated his USERRA rights." *Id*. at 1108. Had only the plain meaning of the release mattered, this analysis would have been irrelevant, and there would have been no need to inquire into whether the plaintiff actually understood the nature and extent of the waiver.

The majority opinion claims that just because the release in *Wysocki* referred to veteran status, that "d[oes] not make that term magic words necessary for release of a USERRA claim."

Majority Op. at 5. But the release's reference to "veteran status," while not magic words, was certainly important to the Court's analysis. It was the specificity of this language that "informed Wysocki that he was waiving his USERRA rights" through the release, when considered alongside the fact that he had significant time to review the release and was encouraged to see a lawyer. *Wysocki*, 607 F.3d at 1108. If the majority opinion's approach were correct, the *Wysocki* Court's analysis could have begun and ended with the fact that Wysocki's release covered "all claims, demands, actions or liabilities . . . against IBM of whatever kind." *Id.* at 1104. The *Wysocki* Court did not adopt such an approach, nor is it appropriate to do so in this case.

In support of its reliance only on the text of the agreement, the majority opinion cites *Nicklin v. Henderson* for the proposition that a waiver must be interpreted by its plain terms. 352 F.3d 1077 (6th Cir. 2003). Not only did *Nicklin* not involve a waiver of USERRA rights, but the *Nicklin* Court explicitly looked to factors beyond the plain text of a release covering "any and all cases" to conclude that it was a knowing release of specific statutory rights. *See id.* at 1080–81. It considered factors such as the plaintiff's background and experience, the amount of time he was given to consider the release, and ultimately "the totality of the circumstances." *See id.* It follows that to decide whether a plaintiff clearly and unambiguously intended to waive his or her USERRA rights, we must look to context. And while the majority opinion bemoans that such an approach may "generate litigation" over settlements, Majority Op. at 4, we must weigh the possibility that settlements may be used to circumvent the full protections offered by remedial schemes like USERRA against any advantages such settlements offer. *See Davis v. Am. Com. Lines, Inc.*, 823 F.2d 1006, 1009 (6th Cir. 1987); *Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 606 (6th Cir. 2013).

Applying these principles to Ward's case, there is at least a genuine dispute of material fact regarding USERRA's first requirement for waiver concerning whether Ward waived his USERRA rights through clear and unambiguous action. On the one hand, unlike the release that covered claims based on "veteran status" in *Wysocki*, Ward's release contained no specific text that would alert him to his rights as a service member, such as a reference to USERRA, military service, or veteran status. Although an attorney was present when Ward received the release, the

parties dispute the extent of Ward's knowledge of his USERRA rights at the time he signed the release. Ward testified that he was aware that he was generally protected by USERRA, but the exact scope of Ward's knowledge is unclear from the summary judgment record. And insofar as Ward was simply aware that he was protected by USERRA, that is different than specifically acknowledging that he was repudiating his USERRA rights.

The record before us fails to indicate that Ward waived his USERRA rights through clear and unambiguous action. It is inappropriate for us to settle any factual dispute in favor of Shelby County, as the majority opinion does, when significant questions persist regarding whether Ward was aware that he was specifically waiving his rights under USERRA's anti-discrimination provisions.

In any case, I would affirm the district court's conclusion that Ward did not waive his USERRA rights because Ward's release still fails the second requirement for a valid waiver, as discussed below.

## II.

Concerned that employers would circumvent USERRA's statutory protections, Congress erected another barrier to the waiver of USERRA rights. Through 38 U.S.C. § 4302(a), Congress took the step of requiring waivers to "establish[] a right or benefit that is more beneficial to, or is in addition to, a right or benefit" provided by USERRA. 38 U.S.C. § 4302(a). And through § 4302(b), it correspondingly prohibited any waivers that limited USERRA rights or benefits. *Id.* § 4302(b). In other words, because "[USERRA] is intended to be a floor and not a ceiling on reemployment rights," Congress sought to enshrine in the statute's text that any USERRA waiver must be more beneficial to a service member than USERRA's statutory minimum. *See* S. Rep. No. 103-158, at 41 (1993) (discussing the meaning of 38 U.S.C. § 4302(a)).

The majority correctly concludes that USERRA requires a court to consider a waiver's adequacy. And it also rightly points out that for a waiver's benefits to be inadequate, there need not be evidence of a mistake, incapacity, fraud, misrepresentation, unconscionability, or duress. After all, it is doubtful that Congress would craft § 4302 as it did—and take pains to emphasize

the protective and remedial nature of USERRA—only to leave a service member with just standard contract defenses for protection. *See, e.g.*, H.R. Rep. No. 103-65, pt. 1, at 19 (1993); S. Rep. No. 103-158, at 40 (1993). But the majority wrongly frames the benefits inquiry to be about whether a service member engaged in "considered judgment" about the waiver's benefits. In other words, the majority holds that if a service member, after due consideration, subjectively believed a waiver to be more beneficial than his USERRA rights, that waiver satisfies 38 U.S.C. § 4302(a).

But USERRA speaks in terms of benefits, it does not speak in terms of beliefs. *See* 38 U.S.C. § 4302. The relevant question under the statute is whether the benefits offered by a waiver are "more beneficial to, or [are] in addition to," those under USERRA. *See id.* § 4302(a). While a service member's judgment about the benefits offered by a waiver is certainly relevant to that analysis, it is not dispositive.

The majority plucks a single line from *Wysocki* to devise its new standard. In that case, we said that "the ability [of service members] to waive their USERRA rights without unnecessary court interference, if they believe that the consideration they will receive for waiving those rights is more beneficial than pursuing their rights through the courts, is both valuable and beneficial to veterans." 607 F.3d at 1108. But in *Wysocki*, we merely made that statement in passing while observing that waivers are, in the best-case scenario, useful. USERRA's protections were, of course, not established only for best-case scenarios. Importantly, after making that statement, the *Wysocki* Court examined Wysocki's waiver to conclude that it "involved a valuable amount of consideration"—an objective assessment of the benefits of the waiver. *Id.* We need not, and indeed should not, overread *Wysocki* to limit us to an inquiry about what the service member believed.

An inquiry that turns entirely on a service member's subjective judgment is both under- and over-inclusive. It would result in upholding a wholly inadequate waiver simply because a service member misguidedly or naively—but perhaps after some contemplation—misjudged the waiver to offer greater benefits. This flies in the face of the purpose of USERRA, which was designed to be an absolute floor on employment and re-employment rights. *See* S. Rep. No. 103-158, at 41 (1993). But conversely, an inquiry that turns on a service member's judgment and

beliefs is also over-inclusive, because it could invalidate a waiver that offers protections that objectively exceed those under USERRA, simply because a service member believed to the contrary. As the last line of defense against inadequate waivers, courts must consider whether waivers serve USERRA's remedial purpose and operate above USERRA's floor, accounting for but also regardless of a service member's judgment.

With that in mind, it is necessary to consider the benefits and rights available to Ward. The potential damages and recovery available to Ward when signing the waiver were considerable. At the time he signed the release, he had been terminated from Shelby County for sixteen months and suspended without pay for even longer. In addition to nearly two years of lost income because of his termination, he lost out on his ability to make pension contributions and on years of employment going toward his pension. And a grand jury relied on Shelby County's criminal investigation to indict Ward, upheaving Ward's life until his charges were voluntarily dismissed by the prosecution over a year later. Yet in exchange for the waiver of all of his legal rights, Ward was provided with a mere three weeks of back pay and was not guaranteed any long-term employment with the county because the release promised him only a probationary six-month position. Furthermore, the record reveals that Ward did not sign the waiver because he thought these benefits exceeded the floor set out by USERRA, *see* S. Rep. No. 103-158, at 41 (1993), but because he "had been out of work 18 months" and had no other option. Ward Dep., R. 64-2, Page ID #832; *cf. Resner v. Arctic Orion Fisheries*, 83 F.3d 271, 274 (9th Cir. 1996) (upholding the district court's invalidation of a release of claims against a ship owner where the consideration was not based on the seaman's "informed evaluation of his damages but on the sum of his outstanding debts"). It is no wonder that within about a month of signing the release, Ward told Shelby County it was not in his best interest to accept its offer of a probationary position.

Even under the majority's test, Ward certainly did not waive his rights after "considered judgment." Majority Op. at 7. As the record demonstrates, he waived his rights out of desperation, having lost nearly two years of income and after facing the ramifications of being criminally charged for more than a year. But reading USERRA and its legislative history faithfully, a correct analysis would compare Ward's possible benefits under USERRA against his

waiver's three weeks of back pay and the offer of a probationary six-month position.  Given the special solicitude Congress demonstrates for service members through USERRA, Ward's waiver was clearly inadequate and undoubtedly not more beneficial to his rights under USERRA than his statutory protections.  There is therefore no need to send this case back to the district court for further consideration by a jury, as the majority would have us do.

### III.

In light of the above, the brief general release Ward signed was not valid.  The release failed to satisfy USERRA's stringent requirements to waive its protections, given that the release's mere three weeks of back pay and probationary reinstatement for six months did not provide rights or benefits more advantageous to or in addition to Ward's USERRA rights.  *See* 38 U.S.C. § 4302(a).  As to the remaining motions on appeal, which remain pending after resolution of the waiver issue, I would conclude that the district court correctly affirmed the jury's verdict and damages award.  I would therefore affirm the district court's judgment in its entirety.  For those reasons, I respectfully dissent.